## KERBAUGH-EMPIRE CO. v. BOWERS, Collector of Internal Revenue.

(District Court, S. D. New York. April 18, 1924.)

**1. Internal revenue ⊝⇒7—Increase in assets over liabilities, resulting from paying debt due in marks of depreciated value, held not "income."**

Where borrower of German marks repaid debt eight years later, when marks had fallen in value difference was not taxable as income, under Const. Amend. 16, nor Revenue Act Nov. 23, 1921, §§ 213, 230, 232, 233 (Comp. St. Ann. Supp. 1923, §§ 6336⅛ff, 6336⅛nn, 6336⅛oo, 6336⅛p), since it was not derived from employment of capital, labor, or both, or from sale or conversion of capital assets resulting in profit, there being no such thing as negative income.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Income.]

**2. Constitutional law ⊝⇒27—Internal revenue ⊝⇒2—Effect of income tax amendment stated.**

Const. Amend. 16, was not grant of power to tax income, because Congress always had such power, but merely removed necessity for apportionment among states of taxes on income, under article 1, § 2, cl. 3, and article 1, § 9, cl. 4.

At Law. Action by the Kerbaugh-Empire Company against Frank K. Bowers, as Collector of Internal Revenue, Second New York District. On defendant's motion to dismiss amended complaint, on the ground that it does not state facts sufficient to constitute a cause of action. Motion denied, and decree entered for plaintiff.

Kellogg & Rose, of New York City (Franklin Nevius, of New York City, and Harvey D. Jacob, of Washington, D. C., of counsel), for plaintiff.

William Hayward, U. S. Atty., and Victor House, Sp. Asst. U. S. Atty., both of New York City, and Nelson T. Hartson, Solicitor of Internal Revenue, and Preston C. Alexander, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for defendant.

GODDARD, District Judge. This action is brought by the plaintiff to recover the sum of $5,198.77 paid by plaintiff under protest on June 13, 1922, as the first and second quarterly installments of corporation income tax for the calendar year 1921. The defendant has filed a motion to dismiss the amended complaint, on the ground that it does not state facts sufficient to constitute a cause of action. The cause comes on for hearing on this motion. The essential allegations of the amended complaint that are pertinent to the question involved in this motion are as follows:

That defendant, at all the times material, was the collector of internal revenue for the Second district of New York; that plaintiff, a New York corporation, was the owner of all the stock of certain subsidiary corporations, including H. S. Kerbaugh, Inc., a Pennsylvania corporation, which on and prior to June 8, 1911, was engaged in the performance of large construction contracts in connection with the building of the Kensico dam in New York; that on that date its subsidiary was in need of funds to finance its construction contracts, and in order to

⊝⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

secure funds, which it could advance to the subsidiary for that purpose, applied to the Deutsche Bank of Berlin, through its New York agent, one Edward D. Adams, to make the necessary advances. The bank agreed to extend the required credit, but only on condition that the notes therefore be made payable as to both principal and interest in German marks or their equivalent in United States gold coin at prime bankers' rate in the city of New York for cable transfers to Berlin. Commencing on June 8, 1911, the loans were made in accordance with the following procedure:

That plaintiff would advise Mr. Adams of the amount of money needed in terms of dollars. The latter would cable to the bank in Berlin for an amount of marks equivalent to plaintiff's need in dollars. The bank would, by cable transfer, credit Mr. Adams in some banking institution in New York with the number of marks equivalent to the number of dollars needed by plaintiff. That Mr. Adams, upon receipt of this credit, would draw his check against the sum payable in dollars, deliver it to the plaintiff, and upon its presentation by plaintiff to the bank against which it was drawn the check would be paid to plaintiff in dollars. That in exchange for each check plaintiff would deliver to Mr. Adams its promissory note, payable as to both principal and interest in reichsmarks. On the dates when the interest fell due, Mr. Adams advised as to the prevailing rate of exchange, and plaintiff handed him its check in dollars for the number of marks due.

Between June 8, 1911, and July 2, 1913, loans were made to plaintiff in the manner above set out, the total amount of dollars actually received by plaintiff being $1,983,000, and the equivalent in terms of reichsmarks, at the prevailing rate of exchange at the time loans were made, being 8,341,337.50. Plaintiff made such payments on account of these loans that on September 1, 1913, there remained unpaid 6,740,-800 marks, and on the last-mentioned date its old notes were all surrendered and a new note given by it for this balance. On the due date of the renewal note, it was surrendered and a new note given for the same amount. This new note read as follows:

"Rm. 6,740,800                                                    March 2, 1914.
   "On April 1, 1915, for value received, the Kerbaugh–Empire Company promises to pay to its own order six million seven hundred forty thousand, eight hundred reichsmarks (rm. 6,740,800), at its office in New York City, with interest at the German Bank rate as it may be established from time to time, but at not less than 6 per cent. per annum, and 1 per cent. commission per annum, payable June 1, 1914, and quarterly thereafter, both principal and interest being payable in German reichsmarks or their equivalent in United States gold coin at prime bankers' rate in the city of New York for cable transfers to Berlin, Germany,          The Kerbaugh-Empire Company,
                                        "By C. A. Nicklas, Treasurer.
   "Countersigned: M. A. Hauschild, Vice President."

After the execution and delivery of the latter note such payments were made on account of the principal thereof that by March 31, 1915, the principal amount due thereon was reduced to 3,216,445 marks. All the funds borrowed by the plaintiff from the Deutsche Bank were loaned by it to its subsidiary for use in financing its construction contracts. The carrying on by the subsidiary of its contracts resulted in its losing all the money so advanced to it. The subsidiary claimed and was allowed a loss of such amounts in its income tax returns for the

years 1913, 1914, 1916, 1917, and 1918. The amount of such losses so largely exceeded any income accruing to the subsidiary in those years as to leave a large excess of losses over income; the total of this excess of losses being in excess of $684,456.18. Of the balance of 3,216,445 marks remaining unpaid on March 31, 1915, only 1,892,000 marks were borrowed subsequent to March 1, 1913.

After the United States entered the war, the Alien Property Custodian called upon the plaintiff to pay over to him the amount of the note; the Deutsche Bank being an alien enemy. Negotiations were entered into between the plaintiff and the Alien Property Custodian with a view to liquidating the claim. After considerable dispute, the matter was finally adjusted, and the company; under protest, paid to the Alien Property Custodian, $113,688.23 in full settlement of both principal and interest. Of this sum $80,411.12 represented settlement of principal and $33,277.11 represented interest. The rate of exchange in determining the dollar equivalent of the number of marks under the note was slightly above the prevailing current of exchange—about 2½ cents per mark. This settlement was reached and payment to the Alien Property Custodian made in 1921. The result of the transaction was that, by reason of the fall in the value of the mark, plaintiff was able to discharge the principal of its loan of approximately $770,000 by the payment of $80,411.12. The difference between the principal amount borrowed (approximately $770,000) and the amount paid in settlement of the principal ($80,411.12) was $684,456.18.

The Commissioner of Internal Revenue treated this sum of $684,-456.18 as income for the year 1921, and assessed against the plaintiff the tax sought to be recovered in this suit. Without this item the plaintiff's income tax return for this year shows no taxable income, but, instead, a large deficit. The plaintiff paid the tax under duress and protest, and filed its refund claim, which was rejected.

### The Statute.

The pertinent provisions of the Revenue Act under which the Commissioner claims, are as follows:

Revenue Act of 1921 (Act of Congress approved November 23, 1921, 42 Stat. 237–254 [Comp. St. Ann. Supp. 1923, §§ 6336⅛nn, 6336⅛oo, 6336⅛p]):

"Sec. 230. That, in lieu of the tax imposed by section 230 of the Revenue Act of 1918, there shall be levied, collected, and paid for each taxable year upon the net income of every corporation a tax at the following rates:

"(a) For the calendar year 1921, 10 per centum of the amount of the net income in excess of the credits provided in section 236. * * *

"Sec. 232. That in the case of a corporation subject to the tax imposed by section 230 the term 'net income' means the gross income as defined in section 233 less the deductions allowed by section 234. * * *

"Sec. 233. (a) That in the case of a corporation subject to the tax imposed by section 230 the term 'gross income' means the gross income as defined in sections 213 and 217. * * *"

"Sec. 213. That for the purposes of this title (except as otherwise provided in section 233) the term 'gross income'—

"(a) Includes gains, profits, and income derived from * * * businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from

* * * the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. The amount of all such items * * * shall be included in the gross income for the taxable year in which received by the taxpayer. * * * "

[1] The question involved is whether a settlement with the Alien Property Custodian, made in 1921, by paying to that official an amount in dollars fixed after a dispute as to such amount to be paid to discharge a debt payable in marks, which had been loaned to plaintiff in the years 1911, 1912, and 1913, was, in fact, income to the plaintiff to the extent of the difference between the value of the marks as borrowed in the years 1911, 1912, and 1913, and the amount for which the corporation made such settlement with the Alien Property Custodian in the year 1921. That difference amounted to $684,456.18. An examination of a copy of the plaintiff's consolidated corporation income and profits tax return for the year 1921, filed for itself and its subsidiaries, shows that, were it not for the inclusion, under Schedule A, item 10, of the item of $684,456.18, the company, instead of showing taxable income for the year 1921, would, on the contrary, show a loss of $581,254.77.

The plaintiff contends that on the statement of facts as set forth in the complaint, and as next hereinafter summarized, it was not required to pay income tax on any amount arrived at by including the item of $684,456.18, because:

"First. That amount was not income realized by the plaintiff, within the intent and meaning of the Sixteenth Amendment to the United States Constitution.

"Second. Under the provisions of the Revenue Act of 1921, assuming, for the sake of argument, the power of Congress to tax gains and profits in addition to incomes, the amount of the items in question did not constitute either income, profit, or gain to the plaintiff; and

"Third. Assuming, for the sake of argument, that the plaintiff did receive as income, profit or gain, as defined in the Revenue Act of 1921, the sum of $684,456.18, that amount was received by the plaintiff during the years 1911, 1912, and 1913, and should not have been included as income received in the year 1921."

Does the item of $684,456.18 constitute income "from whatever source derived"? If the item was not income, then it does not come within the provisions of the Sixteenth Amendment, and any attempt to tax it under the Revenue Act of 1921 is unconstitutional. The Sixteenth Amendment to the United States Constitution is as follows:

### Taxes on Incomes.

"The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several states, and without regard to any census or enumeration."

[2] The effect of the Sixteenth Amendment was not to grant power to Congress to tax incomes because that power it always had. It was adopted to meet the decision of the United States Supreme Court in Pollock v. Farmers' Loan & Trust Co., 157 U. S. 429, 15 Sup. Ct. 673, 39 L. Ed. 759; that decision having declared the act of 1894 (28 Stat. 509) unconstitutional, not because Congress had no power to tax income, but because, so far as the act of 1894 operated to tax incomes derived from property, either real or personal, it was considered a di-

rect tax, which, under the provisions of article 1, section 2, clause 3, and article 1, section 9, clause 4, of the Constitution, would require apportionment. This was clearly pointed out by the Supreme Court in the cases of Flint v. Stone Tracy Co., 220 U. S. 107, 31 Sup. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312; Brushaber v. Union Pacific Railroad Co., 240 U. S. 1, 36 Sup. Ct. 236, 60 L. Ed. 493, L. R. A. 1917D, 414, Ann. Cas. 1917B, 713; Eisner v. Macomber, 252 U. S. 189, 40 Sup. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570, said:

"'Income may be defined as the gain derived from capital, from labor, or from both combined,' provided it be understood to include profit gained through a sale or conversion of capital assets."

This definition has been reaffirmed in Merchants' Loan & Trust Co. v. Smietanka, 255 U. S. 509, 41 Sup. Ct. 386, 65 L. Ed. 751, 15 A. L. R. 305; United States v. Phellis, 257 U. S. 156, 42 Sup. Ct. 63, 66 L. Ed. 180. The definition contains five elements: (1) Gain derived from capital. (2) Gain derived from labor. (3) Gain derived from capital and labor combined. (4) Profit gained through sale of capital assets. (5) Profit gained through conversion of capital assets.

The item involved in the case at bar was not derived from the use of capital; it was not derived from the use of labor; it was not a gain from the sale of capital assets, for there was no sale of capital assets. The only possible element of the definition upon which the Internal Revenue Commissioner could have based the claim is therefore the element of gain from a conversion of capital assets. But there seems to have been no conversion of capital assets, for all that the plaintiff did was to pay a debt and thereby eliminate an item of liability. In view of the Supreme Court decisions, it appears that to constitute an income as a result of conversion of capital assets, there must be in the hands of the taxpayer, as said in Eisner v. Macomber, supra:

"Something of exchangeable value proceeding from the property, severed from the capital, however invested or employed, and coming in, being 'derived,' that is, received or drawn by the recipient (the taxpayer) for his separate use, benefit and disposal; that is, income derived from property. Nothing else answers the description."

Certainly there was no conversion of capital to bring the transaction in the case at bar within the intent of the five elements of the definition, for the reason that the capital after the transaction was exactly what it was before. All that happened as a result of the transaction was the payment of a debt. There was nothing severed from the capital that came into the taxpayer within the intent of the Supreme Court's holding in the Eisner Case. There was nothing that the taxpayer had that was derived, received, or drawn as an item or thing separated from the capital, and that essential element of income resultant from the conversion of capital is nonexistent in the case at bar.

As has been forcibly stated by counsel for plaintiff, stripped of many of its complications, the situation presented here is about as follows: A. borrowed from B. in 1911 the sum of $1,000. A., immediately after borrowing that sum, lost or spent it. In 1921 A., not having earned anything as the result of personal efforts or use of capital, had in his possession the sum of $100. With that $100 A. approaches B. and offers

him the $100, which is all the money he has, if B. will take it as a full settlement of the $1,000 indebtedness. B. accepts it in full settlement of the indebtedness, and releases A. Has A. any income, within the meaning of the word "income" as used in the Sixteenth Amendment? If so, where is it, and how or when did he receive it? If A., in the illustration, has no income, then clearly this plaintiff had no income in 1921 in the item of $684,456.18, and is entitled to judgment.

It cannot be said that the use of the words "profit or gain," in addition to the word "income," in the Internal Revenue Act of 1921, justifies the ruling of the Internal Revenue Commissioner, even though the item in question was not in fact income, for Eisner v. Macomber, supra, holds that the taxing power of Congress cannot exceed the authority of the Sixteenth Amendment; nor can it be contended that the tax in question can be sustained under the act as claimed extension of the amendment, for then, to the extent that the act exceeds the authority of the amendment, it would be unconstitutional under Eisner v. Macomber. The Internal Revenue Commissioner apparently based his decision on the theory that, although in ordinary operations "the borrowing of money and the payment of a loan is a capital transaction, which ordinarily does not result in a taxable gain or deductible loss," nevertheless in this particular transaction the Commissioner held that the rule that borrowing money and repaying loans is a capital transaction is changed, because the bank insisted that, when the plaintiff repaid the loan, it should repay in marks or their equivalent in dollars.

This ruling was based on an attempt to draw an analogy between the transaction of the case at bar and income which a dealer in foreign exchange might have, resultant from the purchase and sale of the currency of a foreign nation. But this plaintiff was not dealing in foreign exchange. It paid its debt in dollars, although, for the purpose of calculating the amount of the settlement, that settlement was based on a rate of exchange in marks. In the case at bar all that plaintiff did was to borrow money from a foreign bank in the currency of the country in which the bank was located, lose that money, and then, eight years later, pay its debt in dollars at the equivalent at the then value of marks. Nothing has been severed from the plaintiff's capital as a result of this transaction which has come into the plaintiff. The improvement of the plaintiff's balance sheet is not income to the plaintiff. All that it had was a decrease in liability. In Eisner v. Macomber, supra, it was held that "enrichment through increase in value of capital investment is not income in any proper meaning of the term."

In the Smietanka and Phellis Cases, the Supreme Court held that, when stock or property are sold, income is realized to the extent of the difference between the value of such stock or property at the time it was purchased and the amount realized on such sale. Those cases follow within the definition of income as given in the Eisner Case, because they were based either on sale of capital assets, as in the Smietanka Case, or a conversion of capital assets, as in the Phellis Case.

In the case at bar, there was no sale of capital assets, nor was there any such conversion of capital assets, as existed in the Phellis Case. On the government's theory, all that the plaintiff could have had is an

accretion of assets. As a matter of fact there was not even an increase of assets. There was a decrease of assets through the payment of a part of plaintiff's assets in settling the indebtedness. The fact that after the transaction the plaintiff's balance sheet had improved was not sufficient to constitute "a gain derived from capital." If anything, it was a gain accruing to capital, and, as such, under the Eisner and Phellis Cases, was not taxable income.

If we were to assume that Congress had power to enlarge, as done in section 213 of the Revenue Act of 1921 (Comp. St. Ann. Supp. 1923, § 6336⅛ff), there is nothing in this section that justifies the Internal Revenue Commissioner including this item of $684,456.18 in the gross income, or that an income tax should be based on such item. The pertinent provision of the Revenue Act of 1921 is section 213, which reads as follows:

"That for the purposes of this title (except as otherwise provided in section 233) the term 'gross income'—

"(a) Includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever."

The provisions of section 213 are obviously broader than the language of the Sixteenth Amendment. The item was not income; that leaves for consideration only the two elements. Was it gain, or was it profit? It seems clear that, under the Revenue Act, the intent was to tax only gains or profits resultant from the employment of capital. We can eliminate the theory that it was a gain or profit, through dealing in foreign exchange. That, then, leaves the proposition that if, at the end of any taxable year, the balance sheet of a taxpayer shows a greater difference between assets and liabilities than it did at the end of the preceding taxable year, the excess of difference is taxable as such. However, that leaves out of consideration the essential element to make such a difference taxable income, which is the necessity that it shall be derived from the employment of capital or labor, or from the sale or conversion of capital assets, resulting in a profit from such sale or conversion.

The plaintiff paid a debt in 1921 for a lesser amount in dollars than it had secured through borrowing amounts in marks in 1911, 1912, and 1913. It is equivalent to a release of obligation to that extent. If the debt had been released in full, there could have been no tenable claim made that the plaintiff gained income to the extent of the amount of the debt. For the Circuit Court of Appeals in United States v. Oregon-Washington Railroad & Navigation Co., 251 Fed. 211, 213, 163 C. C. A. 367, 369, held that, where an indebtedness of a corporation was canceled, the amount of the indebtedness so canceled did not and could not constitute income. In the opinion in that case it stated:

"Now, it seems to us hardly arguable that the cancellation of the debt in question was not in the category of capital. The corporation had just commenced its business; the cancellation of the debt was a means of contribu-

tion to its capital account, quite as though the money had been contributed by the stockholder only to enhance the value of his stock. The financial relief, so given, will, it is true, be eventually reflected in the income, since the defendant will no longer be entitled under the act to deduct the interest on the debt; but that only brings out more clearly its character as capital contribution. We regard the difference as precisely equivalent to the difference between the cancellation of a portion of the mortgage bonds and a cancellation of an equal proportion of their coupons. Common usage would, if we are right, unfailingly allocate the first as an increase in capital assets and the second as an increase in income. That, as we view it, is the proper test of the act."

The Oregon case arose under the Corporation Excise Tax Act (36 Stat. 112), but that act was an excise tax based on the income of the corporation and required a definition of the word "income."

In Southern Pacific Co. v. Lowe, 247 U. S. 330, 38 Sup. Ct. 540, 62 L. Ed. 1142, it was held that the word "income," which was applicable under the Excise Tax Act, will be applied in construing the term "income" under the Income Tax Act. It seems clear that neither the Sixteenth Amendment nor the Revenue Act sought to levy an income tax upon anything except income as it was actually received, and under the Constitution and the Revenue Act of 1921 there can be no such thing as a negative income; the two words being inconsistent.

The defendant's motion for judgment on the pleadings is denied, and a decree may be entered in favor of the plaintiff.